IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KENNETH WARREN PERKINS,

        Petitioner,                 No. 2: 08-cv-2186 MCE KJN P

   vs.

D. K. SISTO,

        Respondent.        <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I. <u>Introduction</u>

        Petitioner is a state prisoner proceeding without counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 1990 petitioner was convicted of second degree murder with an enhancement for use of a weapon.  Petitioner is serving a sentence of 17 years to life.

        In the instant action, petitioner challenges the 2007 decision by the California Board of Parole Hearings ("BPH") finding him unsuitable for parole.  This was petitioner's second subsequent, i.e. third overall, suitability hearing.  (Dkt. 1, at 54.)  This action is proceeding on the petition filed by petitioner on September 17, 2008.  (Dkt. No. 1)   Petitioner alleges that the 2007 decision by the BPH finding him unsuitable for parole was not supported by sufficient evidence.

1    After carefully considering the record, the undersigned recommends that the

2  petition be denied.

3  II.  Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

4    In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined

5  the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254.

6  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the

7  court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the

8  Supreme Court, and an "unreasonable application of" that law.  Id. at 405.  "Contrary to" clearly

9  established law applies to two situations:  (1) where the state court legal conclusion is opposite

10 that of the Supreme Court on a point of law; or (2) if the state court case is materially

11 indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is

12 opposite.

13   "Unreasonable application" of established law, on the other hand, applies to

14 mixed questions of law and fact, that is the application of law to fact where there are no factually

15 on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

16 Id. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid

17 to state court decisions.  While the deference is not blindly automatic, "the most important point

18 is that an *unreasonable* application of federal law is different from an incorrect application of

19 law. . . .  [A] federal habeas court may not issue the writ simply because that court concludes in

20 its independent judgment that the relevant state-court decision applied clearly established federal

21 law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 410-

22 11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

23 objectively unreasonable nature of the state court decision in light of controlling Supreme Court

24 authority.  Woodford v. Viscotti, 537 U.S. 19 (2002).

25   "Clearly established" law is law that has been "squarely addressed" by the United

26 States Supreme Court.  Wright v. Van Patten, 552 U.S. 120 (2008).  Thus, extrapolations of

2

1  settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

2  Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

3  inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

4  unnecessary showing of uniformed guards does not qualify as clearly established law when

5  spectators' conduct is the alleged cause of bias injection).

6          The state courts need not have cited to federal authority, or even have indicated

7  awareness of federal authority, in arriving at their decision.  Early v. Packer, 537 U.S. 3 (2002).

8  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an

9  unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is

10 one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v.

11 Andrade, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority

12 reviewed must be a pronouncement on constitutional principles, or other controlling federal law,

13 as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v.

14 Packer, 537 U.S. at 9.

15         However, where the state courts have not addressed the constitutional issue in

16 dispute in any reasoned opinion, the federal court will independently review the record in

17 adjudication of that issue.  "Independent review of the record is not de novo review of the

18 constitutional issue, but rather, the only method by which we can determine whether a silent state

19 court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

20 2003).

21         When reviewing a state court's summary denial of a claim, the court "looks

22 through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234

23 F.3d 1072, 1079 n.2 (9th Cir. 2000).

24 ////

25 ////

26 ////

III.  Discussion

       A.  Legal Standard

       The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits state action that "deprive[s] a person of life, liberty or property without due process of law."  U .S. Const. amend. XIV, § 2.  A person alleging a due process violation must demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. Kentucky Dep't. of Corrs. v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).  A protected liberty interest may arise from either the Due Process Clause itself or from state laws.  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987). In the context of parole, the United States Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  However, when a state's statutory parole scheme uses mandatory language, it "'creates a presumption that parole release will be granted' when or unless certain designated findings are made, thereby giving rise to a constitutional liberty interest."  McQuillion, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Neb. Penal, 442 U.S. 1, 12 (1979)).

       Under California law, prisoners serving indeterminate prison sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement."  In re Dannenberg, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417 (2005).  Generally, one year prior to an inmate's minimum eligible parole release date, the Board will set a parole release date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public."  In re Lawrence, 44 Cal.4th 1181, 1202, 82 Cal.Rptr.3d 169 (2008) (citing Cal.Penal Code § 3041(a)).  A release date will not be set, however, if the Board determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that

4

1  consideration of the public safety requires a more lengthy period of incarceration. . . ."  Cal.

2  Penal Code § 3041(b).

3         California state prisoners who have been sentenced to prison with the possibility

4  of parole have a clearly established, constitutionally protected liberty interest in receipt of a

5  parole release date.  Allen, 482 U.S. at 377-78 (quoting Greenholtz, 442 U.S. at 12); Irons v.

6  Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v. Cal. Bd. of Prison Terms, 461 F.3d

7  1123, 1128 (9th Cir. 2006)); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion,

8  306 F.3d at 903.

9         In the context of parole proceedings, it is well established that inmates are not

10  guaranteed the "full panoply of rights" afforded to criminal defendants under the Due Process

11  Clause.  See Pedro v. Or. Parole Bd., 825 F.2d 1396, 1398-99 (9th Cir. 1987).  Nonetheless,

12  inmates are afforded limited procedural protections.  The Supreme Court has held that a parole

13  board's procedures are constitutionally adequate so long as the inmate is given an opportunity to

14  be heard and a decision informing him of the reasons he did not qualify for parole.  Hayward v.

15  Marshall, 603 F.3d 546, 560 (9th Cir. 2010) (quoting Greenholtz, 442 U.S. at 16).  As a matter of

16  state constitutional law, denial of parole to California inmates must be supported by "some

17  evidence" demonstrating future dangerousness.  Hayward, 603 F.3d at 562 (citing In re

18  Rosencrantz, 29 Cal.4th 616, 128, 128 Cal.Rptr.2d 104 (2002)); see also In re Lawrence, 44

19  Cal.4th at 1191 (recognizing  the denial of parole must be supported by "some evidence" that an

20  inmate "poses a current risk to public safety"); In re Shaputis, 44 Cal.4th 1241, 1254, 82

21  Cal.Rptr.3d 213 (2008) (same).  "California's 'some evidence' requirement is a component of the

22  liberty interest created by the parole system of [the] state," Cooke v. Solis, 606 F.3d 1206, 1213

23  (9th Cir. 2010), petition for cert. filed, 79 U.S.L.W. 3141 (U.S. Sept. 2, 2010) (No. 10-333), and

24  compliance with this evidentiary standard is, therefore, mandated by the federal Due Process

25  Clause.  Pearson v. Muntz, 625 F.3d 539, 549 (9th Cir. 2010).  Thus, a federal court undertaking

26  review of a "California judicial decision approving the . . . decision rejecting parole" must

1    determine whether the state court's decision "was an 'unreasonable application' of the California

2    'some evidence' requirement, or was 'based on an unreasonable determination of the facts in

3    light of the evidence.'"  Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

4          When assessing whether a state parole board's suitability decision was supported

5    by "some evidence," the analysis "is framed by the statutes and regulations governing parole

6    suitability determinations in the relevant state."  Irons, 505 F.3d at 851.  The court must

7    look to California law to determine what findings are necessary to deem a petitioner unsuitable

8    for parole, and then must review the record to determine whether the state court decision holding

9    that these findings were supported by "some evidence" or whether it constituted an unreasonable

10   application of the "some evidence" principle.  Id.

11         Title 15, Section 2402 of the California Code of Regulations sets forth various

12   factors to be considered by the Board in its parole suitability findings for convicted murderers.

13   The regulation is designed to guide the Board's assessment regarding whether the inmate poses

14   an "unreasonable risk of danger to society if released from prison," and thus whether he or she is

15   suitable for parole.  In re Lawrence, 44 Cal.4th at 1202.  The Board is directed to consider all

16   relevant, reliable information available, including the circumstances of the prisoner's:  social

17   history; past and present mental state; past criminal history, including involvement in other

18   criminal misconduct which is reliably documented; the base and other commitment offenses,

19   including behavior before, during and after the crime; any conditions of treatment or control,

20   including the use of special conditions under which the prisoner may safely be released to the

21   community; and any other information which bears on the prisoner's suitability for release.  15

22   Cal.Code Regs. § 2402(b).

23         The regulation also lists several specific circumstances which tend to show

24   suitability or unsuitability for parole.  15 Cal. Code Regs. § 2402(c)-(d).  Factors tending to show

25   unsuitability include:

26   ////

6

(1) The Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:

> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>
> (C) The victim was abused, defiled, or mutilated during or after the offense.
>
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

(15 Cal. Code Regs. § 2402(c).)

Factors tending to show suitability include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

(15 Cal. Code Regs. § 2402(d).)

The overriding concern is public safety, In re Dannenberg, 34 Cal.4th at 1086, and the focus is on the inmate's current dangerousness.  In re Lawrence, 44 Cal.4th at 1205.  Thus, under California law, the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a parolee's release would unreasonably endanger public safety.  In re Shaputis, 44 Cal.4th at 1241.  Therefore, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public."  In re Lawrence, 44 Cal.4th at 1212.  In other words, there must be some rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  Id. at 1227.

////

////

////

8

B. <u>Analysis</u>

The BPH found petitioner unsuitable for parole in 2007 for the following reasons: 1) petitioner's motive for the crime was inexplicable (Dkt. No. 1, at 102 of 109); 2) the crime was carried out in a manner demonstrating a callous disregard for human suffering (<u>id.</u>, at 103); 3) petitioner had an escalating pattern of criminal conduct (<u>id.</u>); 4) petitioner had an unstable social history (<u>id.</u>); 5) petitioner's participation in self-help was not adequate (<u>id.</u>, at 104); 6) petitioner failed to participate in his psychological evaluation (<u>id.</u>, at 104-05); 7) petitioner did not have adequate parole plans (<u>id.</u>, at 105); 8) petitioner showed a lack of insight and remorse. (<u>Id.</u>, at 101).

In order to put these findings into context, the undersigned will first summarize the facts of the commitment offense as discussed at the 2007 suitability hearing:

> At 5:00 a.m. on October 19th, 1989 officers of the Lake County Sheriff's Department were dispatched to a man reporting that he had accidentally shot another man. The reporting party was supposedly standing in front of Hardester's Store, Hardester being spelled H-A-R-D-E-S-T-E-R apostrophe S, at 16295 Highway 175, Cobb Mountain. Officers contacted the defendant, Kenneth Warren Perkins. Mr. Perkins told officers he had struggled with a man over a gun and accidentally shot him. Perkins thought the victim was dead.
>
> Perkins agreed to take the officers to the location of the accident. En route to the location, Perkins informed the officers he had dropped the gun somewhere in the forest. The incident occurred early in the evening of October 18th, 1989. Officers were taken to a small shack made from various remnant parts of plastic, metal and wood. The shack was approximately six feet by 10 feet by five feet. Found within the shack was the body of Mr. Edward Maher. The deputy was unable to detect any vital signs and believed that Maher was dead.
>
> Other investigating officers were summoned and a complete investigation into the death of Maher was conducted. Physical evidence obtained and expert testimony given seemed to refute the claims of Perkins that the gun was accidentally discharged during a physical struggle between the two men. Instead, the physical evidence and the testimony given by expert witnesses revealed a scenario.
>
> Ma[h]er was inside his shack in a sitting position and possibly

9

1    untying his boot when the defendant, standing somewhere near the
     entrance of the shack, four to six feet away, fired the shotgun at a
2    downward angle into the victim's neck, killing him.

3    According to Sheriff's reports, Mr. Maher's sons, Jeremy and
     Joshua Maher and two friends visited the victim at his campsite on
4    October 18th, 1989 at approximately 4:30 p.m.  While visiting
     their father, who they believed was intoxicated, Kenneth Perkins
5    showed up to the campsite carrying a shotgun.  Joshua and his two
     friends ran over to Perkins and he showed them the gun and
6    actually fired the .12 gauge single shotgun.  Perkins reloaded the
     shotgun and walked with the boys down to Mr. Maher's location.
7
     Later the boys decided to leave and Joshua asked Perkins what
8    time it was.  Perkins removed his wristwatch and gave it to Joshua,
     telling him he could have it.  Joshua looked at the watch and it was
9    7:02 or 7:03 p.m.  The boys left for home.  Just prior to reaching
     their house, which is located just up the hill from the campsite,
10   Joshua heard a gunshot coming from the direction of his father's
     campsite.  It was not until the next morning that authorities learned
11   from Perkins that Mr. Maher had been shot.

12   (Dkt. No. 1, at 32-34.)

13   Petitioner's version of events was also read into the record at the 2007 hearing:

14   He stated he had been consuming alcohol earlier that day since he
     was not working.  At some point, he noticed his dog was missing
15   and he took his shotgun while going out to look for the animal.  At
     one point he stated he saw the victim and they began drinking
16   alcohol and whiskey.

17   During the course of their inebriation, inmate Perkins stated the
     victim kicked him soundly to the left side of his head, causing the
18   right side of his head to hit against a 55 gallon drum.  During his
     expressed astonishment, the victim began to lunge for inmate
19   Perkins's weapon.  At this point, the weapon discharged during the
     struggle and the victim was struck in the throat.
20
     Inmate Perkins made it clear that, in quotes, "I didn't shoot him,"
21   end quotes.  He described holding the weapon and having it
     discharged during the struggle.  Inmate Perkins stated he believed
22   the victim had only fainted, but when he picked him up, he stated
     he heard the sound of sucking air from the wound site.  He stated
23   he panicked, walked off, didn't know what to do, stayed in the
     woods for awhile, went to his house, took a shower and later called
24   the police.

25   He stated if he had a witness, he would not be incarcerated.  He
     stated the victim had numerous prior incidents of kicking people in
26   the head.  He acknowledged he had known the victim, since they

                                    10

1    lived fairly near to each other and had worked together on
     carpentry jobs.
2

3    (Id., at 34-36.)

4          The undersigned first considers whether the BPH had a proper basis for the pre-

5    commitment factors it relied on to find petitioner unsuitable for parole.

6          The record contains no evidence regarding why petitioner shot the victim.

7    However, it is fairly clear that petitioner shot the victim after he (petitioner) had been drinking.

8    Based on these circumstances, the BPH properly found that the motive for the murder was

9    inexplicable.

10         However, the BPH's finding that the offense demonstrated a callous disregard for

11   human suffering is not supported by the record.  Petitioner shot the victim in the neck with a

12   shotgun.  He did not choose an especially painful or slow method for the killing, did not attempt

13   to prolong or exacerbate the victim's suffering, did not terrorize and did not torment the victim.

14   See In re Rico, 171 Cal.App.4th 659, 682, 89 Cal.Rptr.3d 866 (2009).

15         The BPH's finding that petitioner had a pattern of escalating criminal conduct was

16   supported by the record.  In 1963, petitioner was convicted of malicious mischief.  (Dkt. No. 1, at

17   37.)  In 1964, petitioner was convicted of petty theft.  (Id.)  In 1967, petitioner was convicted of

18   assault with a deadly weapon and battery.  (Id., at 39-40.)  In 1978, petitioner was convicted of

19   driving under the influence.  (Id., at 40.)  In 1984, petitioner was convicted of driving under the

20   influence.  (Id.)  In 1987, petitioner was convicted of being under the influence of a controlled

21   substance.  (Id.)

22         The grounds for the BPH finding that petitioner had a history of unstable social

23   relationships are not entirely clear.  The BPH may have been relying on the fact that petitioner

24   was married twice.  (Id., at 50.)  This fact alone does not constitute a history of unstable social

25   relationships warranting a finding of unsuitability for parole.  Accordingly, this factor is not

26   supported by the record.

The undersigned next considers whether the pre-commitment factors properly relied on by the BPH to find petitioner unsuitable for parole were probative of his current dangerousness.

The 2007 hearing was petitioner's second subsequent suitability hearing and petitioner had been in prison for seventeen years of his seventeen years to life sentence. Taking these circumstances into account, as well as the factors relied on by the BPH regarding petitioner's post-commitment conduct, as discussed below, the undersigned finds that the pre-commitment factors were still probative of his current dangerousness.

The BPH properly found that petitioner's participation in self-help following his incarceration was not adequate. In particular, the BPH found that petitioner had not adequately participated in Alcoholics Anonymous ("AA"). At the hearing, petitioner admitted that he was an alcoholic. (Id., at 46.) In the late 1990s, petitioner consistently attended AA. (Id., at 59.) In 2000, petitioner's AA attendance became inconsistent: "Two quarters here on one year, three years with no – two and a half years with no chronos to AA and then a couple in '04, a couple in '05, nothing in '06 and nothing in '07." (Id., at 60.) Petitioner had never had a sponsor. (Id., at 63.) Petitioner told the BPH that he enjoyed AA , but it hurt his back to sit for an hour. (Id.) The BPH did not act improperly in rejecting petitioner's given reason for his inconsistent AA attendance.

The BPH found only one recent chrono in petitioner's file for a programming activity and that was in June 2005 for a Relationship Awareness Workshop. (Id., at 64.) When asked why he had participated in only one programming activity in the last three years, petitioner responded, "No, I can't tell you why, because I don't know." (Id., at 64.)

Regarding his refusal to participate in his psychological evaluation, petitioner told the BPH that he had not seen any prisoner leave the building with a parole date in the last four years. (Id., at 72.) Without the psychological evaluation, the BPH was unable to evaluate several of the factors regarding suitability in the regulations set forth above. The BPH properly relied on

1  petitioner's failure to participate in the psychological evaluation in finding him unsuitable for
2  parole.

3        In finding that petitioner lacked insight and remorse, the BPH was referring to
4  petitioner's version of events, i.e. the shooting was an accident, which was contradicted by the
5  evidence uncovered during the investigation, i.e. the victim was shot from four to six feet away at
6  a downward angle.  Petitioner also expressed a lack of remorse and insight at the hearing with
7  such comments as, "I mean, I've been in prison for 18 years.  I should have been released
8  already." (Id., at 28.)  When asked if he had made amends regarding his commitment offense,
9  petitioner responded, "I have no one to make it to.  I made it to my higher power." (Id., at 62.)
10  However, the victim's wife, two sons and daughter-in-law attended the 2007 suitability hearing.
11  (Id., at 24.)  Petitioner also referred to his offense as an "alleged" crime: "Well, it was a
12  realization that this alleged crime would have never taken place had there not been any liquor
13  involved." (Id., at 81-82.)

14        The BPH properly relied on petitioner's minimizing of his involvement in the
15  crime as well as his lack of insight in finding him unsuitable for parole.  In re Lazor, 172
16  Cal.App.4th 1185, 1202, 92 Cal.Rptr.3d 36 (2009) ("An inmate's lack of insight into, or
17  minimizing of responsibility for, previous criminality, despite professing some responsibility, is a
18  relevant consideration"); In re Elkins, 144 Cal.App.4th 475, 494, 8 Cal.Rptr.3d 82 (2006)
19  ("Elkins had admitted his guilt of these crimes decades earlier. Thus, the Governor relied not on
20  a lack of guilt admission, but on Elkins having delayed coming forward with all circumstances of
21  what he admitted."); In re Rozzo, 172 Cal.App.4th 40, 62, n.9, 91 Cal.Rptr.3d 85 (2009) ("While
22  it is improper to rely on a prisoner's refusal to address the circumstances of the commitment
23  offense in denying parole, evidence that demonstrates a prisoner's insight, or lack thereof, into
24  the reasons for his commission of the commitment offense is relevant to a determination of the
25  prisoner's suitability for parole.").

26        Regarding petitioner's parole plans, petitioner told the BPH that he intended to

1   live with his mother, sister or brother when released.  The BPH expressed concern that it had no

2   letters from petitioner's mother, sister or brother stating that he could live with them upon

3   release. (Dkt. No. 1, at 105.)  The BPH was also concerned that petitioner did not have concrete

4   plans for attending AA upon release.  (Id., at 106.)  The BPH properly relied on petitioner's lack

5   of letters from his family stating he could live with them as well as his failure to have plans to

6   attend AA upon release in finding him unsuitable for parole.

7             For the reasons discussed above, the undersigned finds that the post-commitment

8   factors relied on by the BPH were some evidence of petitioner's current dangerousness.  In

9   particular, petitioner's minimization of his involvement in the offense and lack of remorse, his

10  failure to participate in the psychological evaluation and self-help programs as well as his

11  inadequate parole plans were some evidence that he continued to remain a threat to public safety.

12  These post-commitment factors rendered the circumstances of the commitment offense and his

13  criminal record still relevant in determining current dangerousness.  The 2007 decision by the

14  BPH finding petitioner unsuitable for parole was supported by some evidence that he posed a

15  current risk to public safety.

16            After conducting an AEDPA review, the undersigned recommends that the

17  petition be denied.

18  IV.  Conclusion

19            Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

20  a writ of habeas corpus be denied.

21            These findings and recommendations are submitted to the United States District

22  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

23  one days after being served with these findings and recommendations, any party may file written

24  objections with the court and serve a copy on all parties.  Such a document should be captioned

25  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files

26  objections, he shall also address whether a certificate of appealability should issue and, if so, why

and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:   January 21, 2011

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

per2186.157